# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**UNITED STATES OF AMERICA** and the States of **CALIFORNIA, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, ILLINOIS, NEW JERSEY,** and **TEXAS,** the Commonwealth of **VIRGINIA,** and the **DISTRICT OF COLUMBIA**,

Civil Action No. _____

*Plaintiffs, ex rel.*

[Filed Under Seal],

*Plaintiff-Relators*,

**COMPLAINT**
**(Jury Trial Demanded)**

*v.*

[Filed Under Seal],

*Defendants*.

# FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) (Exempt from ECF)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

**UNITED STATES OF AMERICA** and the States of **CALIFORNIA, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, ILLINOIS, NEW JERSEY,** and **TEXAS,** the Commonwealth of **VIRGINIA,** and the **DISTRICT OF COLUMBIA**,

          *Plaintiffs, ex rel.*

**VILMA GARCIA** and **GALIT MARKS**,

          *Plaintiffs-Relators*,

      *v.*

**CHEMED CORPORATION, VITAS HEALTHCARE CORPORATION, VITAS HEALTHCARE CORPORATION ATLANTIC, VITAS HEALTHCARE CORPORATION MIDWEST, VITAS HEALTHCARE CORPORATION OF CALIFORNIA, VITAS HEALTHCARE CORPORATION OF FLORIDA, VITAS HEALTHCARE CORPORATION OF GEORGIA, VITAS HEALTHCARE CORPORATION OF ILLINOIS, VITAS HEALTHCARE CORPORATION OF OHIO, VITAS HEALTHCARE CORPORATION OF PENNSYLVANIA, VITAS HEALTHCARE OF TEXAS, L.P., VITAS HOLDINGS CORPORATION, VITAS HOSPICE SERVICES CORPORATION,** and **VITAS HOSPICE SERVICES, L.L.C.,**

          *Defendants*.

---

**FILED UNDER SEAL**

Civil Action No. _____

**COMPLAINT
(Jury Trial Demanded)**

## I.    INTRODUCTION

1.    Defendants Chemed Corporation and its VITAS Healthcare subsidiaries (collectively, "Defendants" or "VITAS") are two-timers: they have twice been caught stealing from Medicare and Medicaid.  The first time, in 2017, VITAS settled with the federal government for $75 million and entered a Corporate Integrity Agreement (the "CIA" or the "Prior Settlement") in which they promised to mend their ways. After voluntarily entering the CIA, Defendants promptly ignored its requirements and prohibitions and resumed their illegal practices of admitting non-terminal Medicare and Medicaid patients into hospice care and billing the government for "crisis care" services that were either not provided or were not medically necessary.

2.    Medicare and Medicaid pay for most of the hospice care in the country, at an annual cost of more than $20 billion.  Notably, Medicare and Medicaid, which account for nearly 95% of VITAS's total accounts receivable,[1] paid VITAS about $1 billion in 2019 alone.[2]

3.    Government-funded hospice programs, however, have strict

---

[1] *See* Chemed Corporation 2019 Annual Report, at 9. Medicare and Medicaid comprise approximately 75% of *Chemed*'s consolidated net accounts receivable. *Id*.

[2] *See id*. at 45 (explaining that in 2019 VITAS typically received in excess of $40 million every other week, or more than $1 billion over the course of the year, from the federal government for hospice care).

requirements as to which patients are eligible for hospice care. Most important, a physician must certify that a patient has a prognosis of six months or less to live to qualify for hospice reimbursement under both Medicare and the State Plaintiffs' Medicaid policies.

4.    Hospice patients who experience a "period of crisis" – *i.e.*, a period of acute medical symptoms in which the individual requires continuous care predominantly from nurses – will often be placed on an elevated level of service called "crisis care." 42 C.F.R. § 418.302(b)(2). Medicare and Medicaid pay a substantially enhanced hourly rate to hospice providers to cover these more intensive services; the reimbursement rate for crisis care is the highest daily rate that Medicare pays for hospice services.

5.    The 2017 Prior Settlement and CIA arose from VITAS's practices of (1) having physicians falsely certify patients as eligible for hospice under Medicare's regulations and (2) pressing employees to bill for falsely extended and/or medically unnecessary crisis care for hospice patients, which greatly increased Medicare's payments to VITAS. *See U.S. v. VITAS Hospices Services, L.L.C., et al.*, No. 13-0449-CV-WBCW (W.D. Mo.) (Dkt. 207, at 5).

6.    The CIA became effective on October 30, 2017, and remains in effect at the time of the filing of this Complaint. The CIA addressed VITAS's practices from 2002 to 2013, and required that VITAS create and maintain a compliance

program and comply with several specific obligations.  Among other things, VITAS promised "at least annual training regarding VITAS' CIA requirements and Compliance Program and the applicable Federal health care program requirements" for all officers, directors, employees, and active medical staff.

7.      Defendants failed to properly implement any of the required precautions or procedures established in the CIA because to do so would have hindered their business goals. Instead, after signing the CIA Defendants quickly resumed their unlawful conduct.

8.      VITAS enrolls thousands of ineligible patients for hospice care. To do so, it pays fees to physicians specifically for certifying the patients' hospice eligibility. Such fees, subject to a unique payroll code, constitute kickbacks that violate the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and its state counterparts because one purpose of such payments is to induce the physician to refer patients for hospice care.

9.      VITAS also pays remuneration to Assisted Living Facilities ("ALFs") in the form of free medical staffing and other services to induce the facilities to refer patients, many of them ineligible, to VITAS for hospice enrollment. Such remuneration also violates the Anti-Kickback Statute.  With respect to ALFs, as well, VITAS will admit non-terminal patients to hospice, which allows those patients to remain in the ALF, a residential-style home, instead of being transferred

3

to the medical setting of an SNF.

10.    A comparison of representative census data for VITAS's hospice patients[3] with national Medicare statistics from the National Hospice and Palliative Care Organization[4] makes clear that VITAS is significantly out of sync with the rest of the country in terms of hospice care:

| Primary Diagnosis | No. of Vitas Pts.^ | Prevalence | | Median Days | | Average Days | |
|---|---|---|---|---|---|---|---|
| | | Vitas | NHPCO* | Vitas | NHPCO* | Vitas | NHPCO* |
| Cancer | 198 | 11.00% | 29.60% | 90 | 18 | 138 | 45.6 |
| Circulatory/Heart | 282 | 15.67% | 17.40% | 199 | 31 | 208 | 80.2 |
| Dementia | 1041 | 57.83% | 15.60% | 285 | 55 | 235 | 105.2 |
| Respiratory | 108 | 6.00% | 11.00% | 124 | 21 | 170 | 71.8 |
| Stroke | 48 | 2.67% | 9.50% | 204 | 26 | 217 | 82.1 |
| Chronic Kidney Disease | 10 | 0.55% | 2.20% | 103 | 8 | 157 | 38.1 |
| Other | 123 | 6.83% | 14.70% | 234 | 19 | 210 | 64.3 |
| **Total** | **1810** | | | **220** | **18**[#] | **214** | **89.6**[#] |
| ^ 5-16-20 Census for Vitas Broward (1 year only) | | | | | | | |
| * NHPCO 2018 Deaths by Diagnosis | | | | | | | |
| # NHPCO 2018 Length of Stay | | | | | | | |

11.    Defendants also sought to maximize their reimbursement from Medicare and Medicaid across the country unlawfully by placing patients into crisis care ("CC") and/or maintaining their CC status as often and for as long as

---

[3] The VITAS census data provided herein represents patients in Defendants' Broward County, Florida, system, which is VITAS's second-largest affiliate in the country. Relators have information that statistics for other VITAS affiliates are similar in their deviation from the standard practices of hospice providers.

[4] Available at https://www.nhpco.org/factsfigures/.

4

possible. Indeed, Defendants emphasized to their employees that "[t]he IDEAL hospice patient should have many CC starts and stops." Frequently, however, the crisis care placement was unneeded or was unnecessarily extended.

12. Through the unlawful conduct alleged herein, Defendants have also violated the False Claims Act, 31 U.S.C. § 3729, *et. seq*. (the "FCA"), and are liable for treble damages, civil penalties, and such other relief as accorded by law. Defendants have also violated the laws of the following jurisdictions, and are liable for damages, civil penalties, and such other relief as accorded by state law: The States of California, for violations of the California False Claims Act, Cal. Gov't Code § 12650 *et seq*.; Connecticut, for violations of the Connecticut False Claims Act, C.G.S. § 4-274 *et seq*.; Delaware, for violations of the Delaware False Claims and Reporting Act, 6 Del. C. § 1201 *et seq*.; Florida, for violations of the Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq*.; Georgia, for violations of the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq*.; Illinois, for violations of the Illinois False Claims Act, 740 ILCS 175/1 *et seq*.; New Jersey, for violations of the New Jersey False Claims Act; N.J. Stat. § 2A:32C-1 *et seq*.; and Texas, for violations of the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq*.; the Commonwealth of Virginia, for violations of the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq*.; and the District of Columbia for violations of the District of Columbia False Claims

5

Act, D.C. Code § 2-381.01 *et seq.* (collectively, the "States").

13.   Accordingly, Relators Vilma Garcia and Galit Marks bring this case under the FCA on behalf of the United States and on behalf of the States of California, Connecticut, Delaware, Florida, Georgia, Illinois, New Jersey, and Texas, the Commonwealth of Virginia, and the District of Columbia to recover damages and civil penalties accorded by statute.  Relators also bring this case pursuant to 31 U.S.C. § 3730(h) and Fla. Stat. § 68.088 ("Retaliation") to seek redress from Defendants' discriminatory conduct against each of them, including discharge from employment.

14.   Relators have served a written disclosure of substantially all material evidence and information they possess on the federal and state governments pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure before filing this *qui tam* action.  *See* 31 U.S.C. § 3730(b)(2).

## II.   JURISDICTION AND VENUE

15.   Relators bring this action on behalf of themselves and on behalf of the United States for violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and on behalf of the States of California, for violations of the California False Claims Act, Cal. Gov't Code § 12650 *et seq.*, Connecticut, for violations of the Connecticut False Claims Act, C.G.S. § 4-274 *et seq.*, Delaware, for violations of the Delaware False Claims and Reporting Act, 6 Del. C. § 1201 *et seq.*, Florida, for

6

violations of the Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq*.,

Georgia, for violations of the Georgia False Medicaid Claims Act, Ga. Code Ann.

§ 49-4-168 *et seq*., Illinois, for violations of the Illinois False Claims Act, 740

ILCS 175/1 *et seq*., New Jersey, for violations of the New Jersey False Claims Act;

N.J. Stat. § 2A:32C-1 *et seq*., and Texas, for violations of the Texas Medicaid

Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq*., the

Commonwealth of Virginia, for violations of the Virginia Fraud Against Taxpayers

Act, Va. Code Ann. § 8.01-216.1 *et seq*., and the District of Columbia for

violations of the District of Columbia False Claims Act, D.C. Code § 2-381.01 *et*

*seq*. (collectively, the "State Claims" or "State FCAs").

16.     This Court has federal subject matter jurisdiction over this action

pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732. This Court has supplemental

jurisdiction of the State Claims pursuant to 28 U.S.C. § 1367 and 31 U.S.C. §

3732(b).

17.     This Court has personal jurisdiction over the Defendants pursuant to

31 U.S.C. § 3732(a) because the Defendants can be found in or transact business in

this District.  In addition, many of the acts prohibited by 31 U.S.C. § 3729

occurred in this District. 31 U.S.C. § 3732(a).

18.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a)

because Defendants transact business in this District and numerous acts proscribed

by 31 U.S.C. § 3729 occurred in this District.

19.    Relator's claims and this Complaint are not based upon prior public disclosures of allegations or transactions in a federal criminal, civil, or administrative hearing in which the Government is already a party, or in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation, or from the news media, as enumerated in 31 U.S.C. § 3730(e)(4)(A). Nor are these claims based on any public allegations or complaints in which any of the State Plaintiffs are a party. Relators are unaware of any public disclosure of the allegations herein.

20.    To the extent there has been a public disclosure unknown to the Relators, they are "original sources" under 31 U.S.C. § 3730(e)(4) and similar provisions of the State FCAs.  Relators have direct and independent material knowledge of the information on which the allegations are based and have voluntarily provided the information to the Government before filing this *qui tam* action based on that information.  *See id*.

### III.    PARTIES

**1. PLAINTIFFS**

21.    The **United States of America** is a Plaintiff and a real party in interest in this litigation.

22.    The States of **California, Connecticut, Delaware, Florida, Georgia,**

8

**Illinois, New Jersey**, and **Texas**, the Commonwealth of **Virginia**, and the **District of Columbia** (collectively, the "State Plaintiffs") are Plaintiffs and real parties in interest in this litigation.

23.    Plaintiff-Relator **Vilma Garcia** is a Registered Nurse who has worked in hospice care for about 16 years. Ms. Garcia spent a large part of her career at VITAS and held several roles in the organization's Broward County, Florida, affiliate, including serving as a Patient Care Administrator overseeing the full continuum of care for in-home patients assigned to her team. In this role, Ms. Garcia was responsible for quality improvement and regulatory compliance. She regularly worked with national-level VITAS management. Ms. Garcia left VITAS in 2020 after being retaliated against and harassed by VITAS management.

24.    Plaintiff-Relator **Galit Marks** is a Registered Nurse who has spent the majority of her career in hospice care management. Ms. Marks worked at VITAS for about seven months in 2019-2020, where she served as a Patient Care Administrator for the Broward County, Florida, program. In this role, Ms. Marks oversaw care of hospice patients in assisted living facilities and nursing homes. She also managed the company's education and performance improvement departments. Ms. Marks reported ethics violations to general and national supervisors and was subsequently retaliated against by management as a result of same.

**2.  DEFENDANTS**

25.   Defendant **Chemed Corporation** is a publicly traded Delaware corporation with its principal place of business in Cincinnati, Ohio. It trades on the NYSE under the symbol CHE.

26.   Defendant **VITAS Healthcare Corporation** is a Delaware corporation with its principal place of business in Miami, Florida. It is a wholly owned subsidiary of Chemed Corporation.

27.   Defendant **VITAS Healthcare Corporation Atlantic** is a Delaware corporation with its principal place of business in Miami, Florida. It is a wholly owned subsidiary of Chemed Corporation.

28.   Defendant **VITAS Healthcare Corporation Midwest** is a Delaware corporation with its principal place of business in Miami, Florida. It is a wholly owned subsidiary of Chemed Corporation.

29.   Defendant **VITAS Healthcare Corporation of California** is a Delaware corporation with its principal place of business in Miami, Florida. It is a wholly owned subsidiary of Chemed Corporation.

30.   Defendant **VITAS Healthcare Corporation of Florida** is a Delaware corporation with its principal place of business in Miami, Florida. It is a wholly owned subsidiary of Chemed Corporation.

31.   Defendant **VITAS Healthcare Corporation of Georgia** is a

Delaware corporation with its principal place of business in Miami, Florida. It is a wholly owned subsidiary of Chemed Corporation.

32.    Defendant **VITAS Healthcare Corporation of Illinois** is with its principal place of business in Miami, Florida. It is a wholly owned subsidiary of Chemed Corporation.

33.    Defendant **VITAS Healthcare Corporation of Ohio** is a Delaware corporation with its principal place of business in Miami, Florida. It is a wholly owned subsidiary of Chemed Corporation.

34.    Defendant **VITAS Healthcare Corporation of Pennsylvania** is a Delaware corporation with its principal place of business in Miami, Florida. It is a wholly owned subsidiary of Chemed Corporation.

35.    Defendant **VITAS Healthcare of Texas, L.P.** is a Delaware limited partnership with its principal place of business in Miami, Florida. It is a wholly owned subsidiary of Chemed Corporation.

36.    Defendant **VITAS Care Solutions, Inc**. was a Delaware corporation with its principal place of business in Miami, Florida. It was a wholly owned subsidiary of Chemed Corporation until 2016.

37.    Defendant **VITAS HME Solutions, Inc.** is a Delaware corporation with its principal place of business in Miami, Florida. It is a wholly owned subsidiary of Chemed Corporation.

11

38.     Defendant **VITAS Holdings Corporation** is a Delaware corporation with its principal place of business in Miami, Florida. It is a wholly owned subsidiary of Chemed Corporation.

39.     Defendant **VITAS Hospice Services Corporation** is a Delaware corporation with its principal place of business in Miami, Florida. It is a wholly owned subsidiary of Chemed Corporation.

40.     Defendant **VITAS Hospice Services, LLC** is a Delaware limited liability company with its principal place of business in Miami, Florida. It is a wholly owned subsidiary of Chemed Corporation.

## IV.     LEGAL BACKGROUND

### A. MEDICARE

41.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program (or "Medicare").  It is a federally funded government health program, created by Congress in 1965, that primarily benefits the elderly and the disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS").

42.     There are four parts to Medicare: Medicare Part A (hospital insurance); Medicare Part B (medical insurance); Medicare Part C (Medicare Advantage, formerly known as Medicare + Choice); and Medicare Part D

12

(prescription drug coverage that was enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") and went into effect on January 1, 2006).

43.    All healthcare providers are obligated to comply with applicable statutes, regulations, and guidelines in order to be reimbursed by Medicare under what is known as "Part A," as described above. When participating in Medicare, a provider has a duty to be knowledgeable of the statutes, regulations, and guidelines for coverage of Medicare services, and, in the case of hospice care, to know that Medicare only reimburses for services that are reasonable and necessary for the palliation or management of terminal illness. 42 U.S.C. § 1395y(a)(1)(C).

44.    Further, all healthcare providers that submit claims for payment to Medicare certify, *inter alia*, that "payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare." CMS Form 855i, Medicare Enrollment Application Physicians and Non-Physician Practitioners (dated 12/18), at 23.

45.    In short, all Medicare providers are expected to deal honestly with the Government and with patients.

13

### 1. THE MEDICARE HOSPICE PROGRAM

46.     Medicare Part A generally pays for inpatient services for eligible beneficiaries in hospitals, hospices, and skilled nursing facilities, as well as some home healthcare services. 42 U.S.C. §§ 1395e - 42 U.S.C. §§ 1395i-5.  In particular, Medicare Part A covers hospice care under 42 U.S.C. § 1395x(dd).

47.     Hospice is a program designed to provide patients with palliative care (*i.e.*, care designed to relieve the pain, symptoms, or stress of terminal illness) instead of curative care (*i.e.*, care designed to cure an illness or condition). Hospice palliative care includes a comprehensive set of medical, social, psychological, emotional, and spiritual services for terminally ill individuals. To be covered, hospice services must be reasonable and necessary for the palliation and management of a patient's terminal illness as well as related conditions. Medicare outlines the admission criteria for various illnesses.

48.     Hospice is available to terminally ill individuals for two initial 90-day periods, and then an unlimited number of 60-day periods, as long as certain conditions are met, as described later. Medicare Benefit Policy Manual, Chapter 9, §§ 10, 20.1.

49.     In order to be eligible to elect hospice care under Medicare, an individual must be (a) entitled to Part A of Medicare; and (b) certified as terminally ill in accordance with 42 C.F.R. § 418.22. *See* 42 U.S.C. § 1395f(7)(A);

14

42 C.F.R. § 418.20.

50.     According to 42 C.F.R. § 418.3, "terminally ill" means that a person "has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course."  One purpose of the Medicare hospice requirements is to ensure that limited Medicare funds are properly spent on patients who are dying and need end-of-life care.

51.     Medicare beneficiaries must elect hospice care (*i.e.*, it is voluntary) and in doing so agree to forgo curative treatment of their terminal illnesses. Patients who receive the Medicare hospice benefit no longer receive care that seeks to cure their illnesses. For this reason, electing hospice care is a critical medical decision for a patient who has been informed that his or her death is imminent.

52.     To bill for hospice care, the hospice provider must ensure that a patient is terminally ill before the individual is faced with the decision to stop receiving medical care that could cure his or her illness. The hospice provider must have a written certification of the patient's terminal illness from an attending physician and/or the medical director of the hospice. 42 C.F.R. § 418.22. Among other things, the certification must include (1) a statement that the individual's medical prognosis is a life expectancy of six months or less if the terminal illness runs its normal course; (2) specific clinical findings and other documentation that support a determination that the patient has a life expectancy of six months or less;

15

and (3) the signature(s) of the physician(s) attesting to these medical conclusions. *Id.*[5]

53.     Recognizing the gravity of a patient's decision to forgo curative care for a terminal illness, Medicare instructs that "a hospice needs to be certain that the physicians' clinical judgment can be supported by clinical information and other documentation that provide a basis for the certification of six months or less if the illness runs its normal course. A signed certification, absent a medically sound basis that supports the clinical judgment, is not sufficient for application of the hospice benefit under Medicare." 170 Fed. Reg. 70534-35.

54.     For the initial 90-day period, the hospice provider must obtain a certification of terminal illness for the patient from both (a) the medical director of the hospice or a physician-member of the hospice interdisciplinary group,[6] and (b) the individual's attending physician, if the individual has an attending physician. For subsequent periods, the hospice provider must obtain the certification of terminal illness from either the medical director of the hospice or a physician who

---

[5] In addition to the Medicare regulations, these important requirements are also contained in the Medicare Benefit Policy Manual, Chapter 9, § 20.1, along with additional descriptions and guidance for hospice providers.

[6] As specified by 42 C.F.R. § 418.56, the interdisciplinary group should consist of, at a minimum, a physician, a registered nurse, a social worker, and a pastor or other counselor. The interdisciplinary group is responsible for coordination of each patient's care, to ensure continuous assessment of each patient's and family's needs, and the implementation of the interdisciplinary plan of care.

16

is a member of the hospice's interdisciplinary group for the patient every sixty days. 42 U.S.C. § 1395f(7)(A); 42 C.F.R. § 418.22.

55.     While a life-expectancy prognosis of six months or less is a necessary condition for reimbursement, regulators recognize that "[p]redicting life expectancy is not an exact science." 75 Fed. Reg. 70372, 70488 (Nov. 17, 2010). Accordingly, there is no statutory limit to the number of periods for which a patient may stay in hospice, as long as the patient is continually recertified as terminally ill.  42 U.S.C. § 1395d(d)(1) (establishing that hospice providers may collect reimbursement for an unlimited number of recertification periods). This framework also recognizes that, in some cases, patients with an initial prognosis of terminality can improve over time, and it allows such patients to exit hospice without losing their right to Medicare coverage to treat illness. 75 Fed. Reg. at 70488.

### 2.  CRISIS CARE

56.     More than 98% of the care hospice patients receive is routine home care, meaning it is the ordinary hospice care the patient receives in residence, whether that is home or a nursing facility. Crisis care is a higher level of medical care available to hospice patients to manage otherwise uncontrollable symptoms and crises. A hospice patient may be elevated from routine care to CC when the hospice patient is experiencing a "brief period[] of crisis," and only as necessary to allow the patient to remain at their residence. 42 C.F.R. § 418.302(b)(2). Medicare

17

defines a brief "period of crisis" as "a period in which the individual requires continuous care to achieve palliation and management of acute medical symptoms." *Id*. at § 418.204(a).  Besides routine home care and CC, there is "inpatient respite care" where caretakers are given a short respite and "general inpatient care" when patients are actually admitted to the hospital.[7] As the tables below show, the difference in Medicare reimbursement rates is substantial:

| Code | Description | FY 2021 Payment Rate |
|---|---|---|
| 651 | Routine Home Care (days 1-60) | $199.25 |
| 651 | Routine Home Care (days 61+) | $157.49 |
| 652 | Continuous Home Care<br><br>Full Rate = 24 hours of care<br><br>Hourly rate= $59.68 | $1,432.41 |
| 655 | Inpatient Respite Care | $461.09 |
| 656 | General Inpatient Care | $1,045.66 |

*See https://www.cms.gov/files/document/mm11876.pdf.* Thus, VITAS can obtain reimbursement up to nine times higher for a patient who is elevated to crisis – or continuous – care.

---

[7] Respite care and general inpatient care are not at issue in this case.

18

57.     CC must involve at least eight hours of predominantly nursing care provided in a 24-hour period, counted from midnight to midnight. Thus, to bill Medicare for CC, a hospice must provide care that: (1) is designed to palliate the patient's acute medical symptoms; (2) is provided to the patient for at least eight hours from midnight to midnight; and (3) consists predominantly of nursing care, meaning care provided by a registered nurse (RN), licensed practical nurse (LPN), or nurse practitioner (NP). *See* 42 C.F.R. §§ 418.302, 418.204.

58.     Unlike the other levels of care, which are paid on a daily rate, CC is reimbursed by the hour based on the actual amount of time that services are provided. Depending on the hours of care logged, a provider will be reimbursed from $477.44 to $1,432.41 each day a patient remains on crisis care.

59.     If the patient receives fewer than eight hours of care in a particular day, the hospice may only bill Medicare for routine care for that day of hospice services. Similarly, if the care provided does not consist predominantly of nursing care, the hospice may not bill Medicare for CC and must instead bill for routine care. *See* 42 C.F.R. §§ 418.302, 418.204. Further, patients on CC are to be re-evaluated every shift to determine if crisis care should continue.

60.     The clinical record for each hospice patient must contain "correct clinical information." 42 C.F.R. § 418.104. All entries in the clinical record must be "legible, clear, complete, and appropriately authenticated and dated." 42 C.F.R.

19

§ 418.104(b). Furthermore,

> [w]hen a hospice determines that a beneficiary meets the requirements for [crisis care], appropriate documentation must be available to support the requirement that the services provided were reasonable and necessary and were in compliance with an established plan of care in order to meet a particular crisis situation. This would include the appropriate documentation of the situation and the need for continuous care services consistent with the plan of care.

*Medicare Benefit Policy Manual, Chapter 9, § 40.2.1. Further, a hospice patient on CC must be reevaluated every shift to ensure the continuing need for CC.*

### 3. THE MEDICARE HOSPICE PAYMENT PROCESS

61.     The United States reimburses Medicare providers with payments from the Medicare Trust Fund, through the Centers for Medicare and Medicaid Services ("CMS"), as supported by American taxpayers. CMS, in turn, contracts with Medicare Administrative Contractors ("Medicare claims processors," also known as "MACs"), to review, approve, and pay Medicare bills, called "claims," received from health care providers like VITAS. In this capacity, the Medicare claims processors act on behalf of CMS.

62.     Payments are typically made by Medicare directly to health care providers like VITAS rather than to the patient. The Medicare beneficiary usually assigns his or her right to Medicare payment to the provider.

63.     The Medicare provider either submits its bill directly to Medicare for payment or it contracts with an independent billing company to submit a bill to the

20

Medicare claims processor on the provider's behalf.

64. Because it is not feasible for the Medicare program, or its contractors, to review the patient files for the millions of claims for payments it receives from hospice providers, the Medicare program relies upon the hospice providers to comply with the Medicare requirements and trusts the providers to submit truthful and accurate claims. Hospice providers are reimbursed based upon their submission of a single electronic or hard-copy form called a "CMS-1450 form."

65. All Medicare providers must have, in each of their patients' files, the medical documentation to establish that the Medicare items or services for which they have sought Medicare reimbursement are reasonable and medically necessary.

66. The physician certifications and other documents that support the claim that hospice providers make to Medicare are submitted to Medicare only if the claim for hospice services is selected for medical review, which does not happen routinely. *See generally* Medicare Claims Processing Manual, Chap. 11, Processing Hospice Claims, and Medicare Program Integrity Manual, Chap. 3, Verifying Potential Errors and Taking Corrective Actions. Additionally, it is the hospice provider like VITAS, not the patient's primary care or treating physician, that is required to submit to Medicare the underlying documentation that supports the eligibility determination and the claim.

67. Once the provider submits its CMS-1450 form to the Medicare claims

processor, the claims are paid directly to the provider.

68.    On the CMS-1450 form, the hospice provider must state, among other things, the identity of the patient, the hospice's provider number, the patient's principal diagnosis, the date of the patient's certification or re-certification as "terminally ill," the location where hospice services were provided, and the level of hospice care provided (i.e., routine home care, crisis care, respite care, or general inpatient care).

69.    On the claim form, the provider also certifies that the claim "is correct and complete," that "[p]hysician's certifications and re-certifications, if required by contract or Federal regulations, are on file," and that "[r]ecords adequately disclosing services will be maintained and necessary information will be furnished to government agencies as required by applicable law."

70.    Finally, federal law requires providers, like VITAS, that receive funds under the Medicare program to report and return any overpayments within specified time periods. 42 U.S.C. § 1320a-7k(d).

## B. MEDICAID

71.    Congress created Medicaid at the same time it created Medicare in 1965 by adding Title XIX to the Social Security Act.  Medicaid is a public assistance program that provides payment of medical expenses primarily for low-income patients.  Funding for Medicaid is shared between the federal and state

22

governments.  The federal government also separately matches certain state

expenses incurred in administering the Medicaid program.  While specific

Medicaid hospice requirements vary from state to state, Medicaid's hospice

coverage is generally modeled after Medicare's hospice coverage. In particular, the

State Medicaid programs at issue in this action limit hospice eligibility to

terminally ill patients certified as having a life expectancy of six months or less.[8]

In addition, Medicaid and Medicare are both subject to certain conditions of

participation and conditions of coverage for hospice.[9] According to CMS, "[w]hen

services are furnished through institutions that must be certified for Medicare, the

---

[8] *See* Cal: 22 Cal. Code Regs. § 51349(c);
https://www.dhcs.ca.gov/formsandpubs/laws/regs/Documents/DHCS-14-021/DHCS-14-021-ISOR.pdf; Conn: Conn. Gen. Stat. § 19a-122b; Conn. Agencies. Reg. §§ 17b-262-830(38), -832; Conn. Agencies. Reg. § 19-13-D72(2); Del: 16 Del. Admin. Code § 4468.5.3; Fl: Fl. Medicaid Policy (*available at* https://ahca.myflorida.com/medicaid/Policy_and_Quality/Policy/behavioral_health_coverage/spec_health_serv/Hospice.shtml); Ga: Ga. Comp. R. & Regs. § 111-8-37.14; Ill: Ill. Handbook for Hospice Agencies, Ch. K-200 (*available at* https://www.illinois.gov/hfs/SiteCollectionDocuments/hospicehandbook.pdf); NJ: N.J. Admin. Code § 10:53A-2.3; Pa: 55 Pa. Code §§ 1130.21-1130.22; Tex: 40 Tex. Admin. Code § 30.14; Va: 12 Va. Admin. Code § 30-50-270; 12 Va. Admin. Code § 30-60-130; DC: D.C. Mun. Regs. tit. 29, § 939; *see also* 42 CFR §§ 418.3, 418.20; 418.22 (federal eligibility requirements, which some states incorporate by reference).

[9] *See, e.g.*, 73 F.R 109, at 32087, 32088 (setting forth "final rule revis[ing] the existing conditions of participation that hospices must meet to participate in the Medicare and Medicaid programs"); 42 C.F.R. Part 418 *et seq.*

institutional standards must be met for Medicaid as well."[10]

## C. THE FALSE CLAIMS ACTS

72.     The federal False Claims Act provides that any person who (1) knowingly presents or causes another to present a false or fraudulent claim for payment or approval by a government payor, or (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim is liable for a civil penalty of not less than $11,803 and not more than $23,607[11] for each such claim, plus three times the amount of the damages sustained by the government.  31 U.S.C. § 3729(a)(1)(A) & (B), 28 C.F.R. § 85.3.

73.     The State Plaintiffs have enacted State FCAs that provide similar prohibitions with respect to Medicaid fraud.

## D. THE FRAUD & ABUSE/ANTI-KICKBACK STATUTES

74.     The Medicare-Medicaid Anti-Fraud and Abuse Amendments, known as the Medicare Anti-Kickback Statute (the "Anti-Kickback Statute"), 42 U.S.C. § 1320a-7b(b), which also applies to state Medicaid programs, makes it illegal for an individual knowingly and willfully to, among other things, offer or pay

---

[10] *See* http://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/CertificationandComplianc/index.html?redirect=/certificationandcomplianc/02_ascs.asp (accessed May 3, 2021).

[11] As adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461; *see also* 86 F.R. 6, at 1725 (DOJ January 11, 2021) (setting forth 2021 adjustments). https://www.govinfo.gov/content/pkg/FR-2021-01-11/pdf/2020-29024.pdf (accessed Apr. 2, 2021).

remuneration in cash or in kind to induce or reward patient referrals or the generation of business involving any item or service payable by government payers, including Medicare or Medicaid. *See* 42 U.S.C. § 1320a-7b(b)(2). In accordance with the Anti-Kickback Statute, Medicare regulations also prohibit providers from receiving remuneration paid with the intent to induce referrals or business orders. See 42 C.F.R. § 1001.952(f). "Remuneration" is broadly defined to include anything of value (including any kickback, bribe, or rebate) paid directly or indirectly, overtly or covertly, in return for purchasing, ordering, or recommending the purchase or order of any service or item that is reimbursable. *Id*.

75. The Balanced Budget Act of 1997 amended the Medicare Anti-Kickback Statute to include administrative civil penalties of up to $50,000 for each act violating the Anti-Kickback Statute, as well as an assessment of not more than three times the amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of that amount was offered, paid, or received for a lawful purpose. *See* 42 U.S.C. § 1320a-7a(a)(10).

76. The Anti-Kickback Statute contains statutory exceptions and certain regulatory "safe harbors" that exclude certain types of conduct from the reach of the statute. *See* 42 U.S.C. § 1320a-7b(b)(3). However, none of the statutory exceptions or regulatory safe harbors protect the Defendants' conduct in this case.

77.     The HHS OIG has explained that "practices that may be common or longstanding in other businesses are not necessarily acceptable or lawful when soliciting federal health care program business." Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731, at 23734 (HHS-OIG May 5, 2003).  Rather, practices are illegal if "any *one* purpose of the remuneration [is] to induce or reward the referral or recommendation of business payable in whole or in part by a federal health care program.  Importantly, a lawful purpose will not legitimize a payment that also has an unlawful purpose." *Id*. (emphasis in original).  The HHS OIG has identified several questions that should be asked to determine if a practice violates the Anti-Kickback Statute, including:

- Does the arrangement or practice have a potential to interfere with, or skew, clinical decision-making?

- Does the arrangement or practice have a potential to increase costs to the federal health care programs, beneficiaries, or enrollees?

- Does the arrangement or practice have a potential to increase the risk of overutilization or inappropriate utilization?

- Does the arrangement or practice raise patient safety or quality of care concerns?

*Id.* When any one of these questions is answered in the affirmative, the practice is likely a violation of federal law.

78.     As set forth in this Complaint, the answer to *all* of these questions with respect to VITAS's (1) payments to doctors to certify and recertify patients for hospice and (2) provision of services and staffing to nursing facilities in

26

exchange for hospice referrals is an unqualified "yes."

79.    In 2010, the Patient Protection and Affordable Care Act ("PPACA"), Public Law No. 111-148, Sec. 6402(g), amended the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), to specifically allow violations of its "anti-kickback" provisions to be enforced under the False Claims Act.  The PPACA also amended the statute's "intent requirement" to make clear that violations of the anti-kickback provisions, like violations of the False Claims Act, may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation."  *Id*. at Sec. 6402(h).

**E. RETALIATION**

80.    The federal False Claims Act also prohibits an employer from "discharg[ing], demot[ing], suspend[ing], threaten[ing], harass[ing], or in any other manner discriminat[ing] against [an employee] in the terms and conditions of employment because of lawful acts done by the employee [] in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations" of the FCA. 31 U.S.C. § 3730(h).

81.    The Florida False Claims Act similarly prohibits retaliation against an employee who acts under the color of law in reporting or participating in an investigation related to a Florida FCA violation. Fla. Stat. §§ 68.088, 112.3187.

27

## V.   <u>FACTUAL ALLEGATIONS</u>

82.   VITAS, which is based in Miami, Florida, operates 43 for-profit hospice "service areas" in thirteen states (California, Connecticut, Delaware, Florida, Georgia, Illinois, Kansas, Missouri, New Jersey, Ohio, Pennsylvania, Texas, and Wisconsin), the Commonwealth of Virginia, and the District of Columbia. *See* https://www.vitas.com/locations-search.

83.   Since 2017, VITAS has received billions of dollars in hospice revenue, the overwhelming majority of which was paid by Medicare and Medicaid. According to VITAS's website, Medicare covers approximately 85.5% of the patients in VITAS's hospice. *See* https://www.vitas.com/hospice-and-palliative-care-basics/paying-for-hospice/who-pays-for-hospice.  Medicaid covers approximately 5% of VITAS's patients.  *Id.*; *see also* Chemed Corporation 2019 Annual Report, at 9 (available at https://www.annualreports.com/HostedData/AnnualReports/PDF/NYSE_CHE_2020.pdf) (accessed August 29, 2021).

### A.  VITAS'S PREVIOUS VIOLATIONS AND THE CORPORATE INTEGRTY AGREEMENT

84.   Beginning in 2007, three whistleblowers separately brought forth their concerns about VITAS's practices. *See United States ex rel. Gonzales v. VITAS Healthcare Corp., et al.*, Case No. 13-0344-CV-W-BCW); *United States ex rel. Urick v. VITAS HME Solutions, Inc., et al.*, Case No. 13-0563-CV-W-BCW);

28

*United States ex rel. Spottiswood v. Chemed Corp. f/d/b/a VITAS Hospice Servs.,*

*LLC, et al.*, (Case No. 13-0505-CV-W-BCW). On May 2, 2013, the United States

intervened and filed a complaint in the Western District of Missouri. *United States*

*v. VITAS Hospice Services, L.L.C.*, Case No. 13-0449-CV-W-BCW.

85.     In its Second Amended Complaint and Complaint in Intervention, the

government alleged that Chemed and VITAS submitted or caused the submission

of false claims to the Medicare program by both: (a) billing Medicare for more

costly CC services when certain patients did not need CC services or when VITAS,

in fact, did not provide such services, or VITAS provided inappropriate medical

care, and (b) admitting certain patients who were not eligible to receive hospice

services (instead of curative care), because the patients did not have a life

expectancy of six months or less if their illnesses ran their normal course. *VITAS*

*Hospice Services, L.L.C.*, Case No. 13-0449-CV-W-BCW, Dkt. 207, at 5 (Filed

July 28, 2015). Chemed and VITAS also submitted or caused to be submitted

fraudulent records and statements in support of their false claims for payment to

the Medicare Program.  *Id*.

86.     The 2013 case against VITAS was litigated heavily, ultimately

resulting in a $75 million settlement between VITAS and the federal government.

*See* U.S. Dep't of Justice, Chemed Corp. and VITAS Hospice Services Agree to

Pay $75 Million to Resolve False Claims Act Allegations Relating to Billing for

Ineligible Patients and Inflated Levels of Care (Oct. 30, 2017) (available at

https://www.justice.gov/usao-cdca/pr/chemed-corp-and-vitas-hospice-services-

agree-pay-75-million-resolve-false-claims-act (accessed Aug. 25, 2021)).

87.    VITAS also entered into a five-year Corporate Integrity Agreement

with HHS OIG, effective October 30, 2017.  *See*

https://oig.hhs.gov/fraud/cia/agreements/Vitas_Hospice_Services_LLC_et%20al_1

0302017.pdf.

88.    The CIA addressed VITAS's practices from 2002 to 2013, and

required that VITAS create and maintain a compliance program and comply with

several specific obligations, including but not limited to:

a. Create a governing body to oversee the compliance program and file written oversight reports with the Office of Inspector General of the U.S. Department of Health and Human Services ("OIG");

b. Develop written standards regarding the operations of the compliance program;

c. Institute a training plan and provide compliance training to officers and employees at least annually;

d. Implement an annual risk assessment and internal review process;

e. Establish and publicize an internal program that allows VITAS employees to report without retaliation concerns about the company's practices that may violate the law; and

f. Develop and follow policies and procedures for reporting to OIG any overpayment of government funds or other enumerated events.

89.    In particular, the CIA directed VITAS to educate its employees on

30

acceptable practices in hospice certification and care. During Relators' tenure at the company, VITAS provided no such education or information to its staff, in direct violation of the terms of its agreement with the government. Neither Relator Galit Marks, who was charged with oversight of continuing education and staff performance during her time at VITAS, nor Relator Vilma Garcia, whose tenure at VITAS included the time period covered by the CIA and whose role included compliance management, was ever informed of the CIA's existence or its requirements.

90.    The CIA is still in effect as of the date of the filing of this Complaint, and will remain in effect until October 2022.

## B. FRAUDULENT ADMISSIONS AND RECERTIFICATIONS OF HOSPICE PATIENTS

91.    VITAS admits patients to its hospice program who are ineligible for hospice care under federal law, in violation of 42 U.S.C. § 1395f(7)(A) and 42 C.F.R. § 418.20. VITAS has admitted to hospice care a significant number of patients experiencing general age- and disease-related maladies who do not meet end-stage or terminal criteria.

92.    Patients have also remained on VITAS hospice care for significantly longer than the national average for terminal patients admitted under the same diagnosis. VITAS routinely recertifies ineligible patients for continued hospice care, in further violation of 42 U.S.C. § 1395f(7)(A) and 42 C.F.R. § 418.20.

During Relators' time at the company, VITAS's Chief Medical Director for the Broward program, Dr. Jeffrey Wallace, regularly held meetings directing physicians to "find a reason" to recertify patients who did not meet eligibility criteria. Dr. Wallace has told both Relators and others that he knew patients were not eligible for hospice, but instructed that they be recertified regardless. Combined with the initial admission of ineligible patients, VITAS's practice of recertifying ineligible patients has resulted in ineligible patients languishing in hospice care, sometimes for years.

93.     Below is a comparison of 2018 national data reported by the National Hospice and Palliative Care Organization ("NHPCO")[12] and census data for VITAS's Broward hospice program, VITAS's second largest program in the

| Primary Diagnosis | No. of Vitas Pts.^ | Prevalence | | Median Days | | Average Days | |
|---|---|---|---|---|---|---|---|
| | | Vitas | NHPCO* | Vitas | NHPCO* | Vitas | NHPCO* |
| Cancer | 198 | 11.00% | **29.60%** | 90 | 18 | 138 | 45.6 |
| Circulatory/ Heart | 282 | 15.67% | 17.40% | 199 | 31 | 208 | 80.2 |
| Dementia | 1041 | **57.83%** | 15.60% | 285 | 55 | 235 | 105.2 |
| Respiratory | 108 | 6.00% | 11.00% | 124 | 21 | 170 | 71.8 |
| Stroke | 48 | 2.67% | 9.50% | 204 | 26 | 217 | 82.1 |
| Chronic Kidney Disease | 10 | 0.55% | 2.20% | 103 | 8 | 157 | 38.1 |
| Other | 123 | 6.83% | 14.70% | 234 | 19 | 210 | 64.3 |
| **Total** | **1810** | | | **220** | **18**[#] | **214** | **89.6**[#] |

^ 5-16-20 Census for Vitas Broward (1 year only)
* NHPCO 2018 Deaths by Diagnosis
# NHPCO 2018 Length of Stay

---

[12] NHPCO Facts and Figures (2020 ed., pub'd Aug. 20, 2020). https://www.nhpco.org/factsfigures/.

country, as of May 16, 2020.[13]

94.    There are several notable aspects of the data. For example, the median stay in hospice of a VITAS patient for the year ending on May 16, 2020, was 220 days, more than twelve times higher than the national median of 18 days for 2018. Similarly, the VITAS average stay was 214 days, more than twice the national average of 89.6 days for 2018.

95.    Moreover, whereas the leading diagnosis of Medicare hospice patients in 2018 was cancer (29.6%), more than half of VITAS's Broward hospice patients had a dementia-related diagnosis (57.83%). Tellingly, cancer patients typically have the shortest length of stay ("LOS") in hospice (the VITAS Broward average was 138 days), whereas dementia patients have the longest LOS (the VITAS Broward average was 235 days).

96.    It is easier to falsely certify a dementia patient as terminal than most other illnesses because the diagnosis is more imprecise and malleable.  Any patient that has some cognitive decline could be diagnosed as having "dementia" or

---

[13] On May 16, 2020, there were several hundred patients who had been in VITAS's Broward hospice program for more than one year, but to make the data comparable with NHPCO's data, which comprised 2018 data only, patients with more than one year's length of stay were counted as one year only. Taking into account *all* of the time patients had been in the Broward hospice program, the average was 360 days, or four times the national average, and the median was 220 days.

"degenerative disease" even though that may not have been the terminal or primary illness. When Relators visited VITAS hospice facilities, they would regularly see patients walking around and participating in activities of self-care; they were clearly not terminal patients. Dementia is, in effect, a loophole that allows VITAS to admit non-terminal patients who lack any other clear-cut diagnosis.

### 1. EXAMPLES OF VITAS PATIENTS WHO WERE INELIGIBLE FOR HOSPICE CARE

97. Following are a few examples of patients whose medical records from initial admission through 2020[14] did not support VITAS's certifications that the patients were eligible for hospice care.

98. Patient 1 has been in hospice care for more than seven years with a diagnosis of Alzheimer's disease. Upon initial evaluation on November 19, 2013, VITAS documentation claims that the patient had a Palliative Performance Scale

---

[14] Because Relators left VITAS employment in 2020, they are unable to provide patient documentation beyond that date. On information and belief, however, at least some of the exemplar patients are still alive and in VITAS's care as of the date of filing of this Complaint.

or "PPS"[15] of 30% and a Functional Assessment Staging Tool or "FAST"[16] level of 7f. A patient with a PPS of 30% is totally bed bound, unable to do any activity, and cannot handle any self-care tasks. A FAST 7f, the highest score on the dementia scale, indicates severe dementia and a mental age equivalent to a newborn baby. A person accurately scored as FAST 7f would not survive for seven years, as VITAS hospice eligibility recertification documents claim for Patient 1. FAST 7f is the final stage of the Alzheimer's process – a patient who meets FAST 7f characteristics may have at most a couple of months to live.

99.    Patient 2  was a female patient in her late 80s with a diagnosis of congestive heart failure. All documentation in Patient 2's file at VITAS shows that she was on room air and had unlabored breathing. Patient 2 was ambulatory – able

---

[15] The PPS assesses a living person's functionality, ranging from 100% (normal) to 10% (totally bed bound). The Victoria Hospice Society initially developed the widely-used and validated PPS in 1996 to assist hospice practitioners in assessing the performance status of palliative care patients based on observable parameters. VHS updated the scale, which is used by VITAS, in 2001. *See* https://victoriahospice.org/wp-content/uploads/2019/12/PPSv2-English-Sample.pdf. *See* PPS Chart *infra* at Section VI.

[16] Dr. Barry Reisberg, a leading expert in Alzheimer's disease, developed the FAST scale to assess a patient's stage of Alzheimer's Disease, focusing on a person's ability to function and perform tasks of daily living. *See* Reisberg B. Functional assessment staging (FAST). Psychopharmacol. Bull. 1988;24(4):653-9. PMID: 3249767. The National Hospice Organization has determined that a person should have a minimum FAST score of 7c to qualify for hospice care. *See* National Hospice Organization. Medical Guidelines for Determining Prognosis in Selected Non-Cancer Diseases. 2nd ed. Arlington, Va: National Hospice Organization; 1996. *See* Fast Scale Chart *infra* at Section VI.

to walk – and ate 50% to 75% of meals. Patient 2 had a body mass index ("BMI") of 20, which is within the normal, healthy weight range, and a PPS of 50%.[17] While Patient 2 was experiencing health decline, she simply was not an end-stage cardiac patient. People with terminal heart disease experience significant symptoms of heart failure or angina at rest, including shortness of breath and/or pain; cannot carry out minimal physical activity without discomfort; and respond poorly or not at all to optimal treatments.

100.   Patient 3 is a female in her 70s with a diagnosis of end-stage Alzheimer's disease, but the 2019-2020 medical records contain inconsistent information about the patient's condition that casts doubt on the truthfulness of Patient 3's "end stage" diagnosis by VITAS providers. For example, on July 22, 2019, the evaluating doctor wrote that Patient 3 had a FAST Score of 7d (indicating lack of trunk support and inability to hold her head up) and a PPS of 20% (bed bound with inability to eat or drink, and an expected survival of less than one week[18]). Four months later on November 27, 2019, records denote a PPS of

---

[17] *See* PPS Chart *infra* at Section VI.

[18] *See* Anderson F, Downing GM, Hill J, Casorso L, Lerch N. Palliative performance scale (PPS): a new tool. J Palliat Care. 1996 Spring;12(1):5-11. PMID: 8857241.

30% (bed bound with some nutritional intake) and a mid-arm circumference[19]

("MAC") of 20cm. Two months later, on January 23, 2020, Patient 3 is

documented to have a MAC of 23cm, indicating weight gain, and a FAST Score of

7c (non-ambulatory but able to sit unassisted). The inconsistent documentation

demonstrates that Patient 3 was experiencing a relative stable – even improving –

condition and does not support a diagnosis of end-stage Alzheimer's disease.

101.   Patient 4  was admitted to VITAS hospice on November 20, 2015,

with an initial diagnosis of cerebral atherosclerosis.[20] Patient 4 was unable to eat

and came to VITAS with a percutaneous endoscopic gastrostomy feeding tube

("PEG tube") inserted for nutrition.[21] In addition, in the History and Physical notes

of January 18, 2016, the VITAS physician wrote:  "The patient was prior on

Catholic Hospice and is discharged for extended prognosis." Patient 4, who had

---

[19] MAC is routinely used by health care providers to assess nutritional status and mortality risk of elderly patients. *See* Measuring Mid-Arm Circumference and Body Mass Index (BMI) (http://www.hhvna.com/files/SkillsFair2016/Hospice_Arm_Circumference_and_B MI.pdf).

[20] Cerebral atherosclerosis results from the thickening and hardening of artery walls in the brain and is a risk factor for stroke and dementia. A diagnosis of cerebral atherosclerosis is often made when a patient exhibits symptoms of dementia in the absence of meeting criteria for Alzheimer's disease or other dementia syndromes.

[21] It is well-documented in medical studies that dementia patients with a PEG tube have a likelihood of extended survival. *See* Lynch MC. Is tube feeding futile in advanced dementia? Linacre Q. 2016 Aug;83(3):283-307. doi: 10.1080/00243639.2016.1211879. PMID: 27833208; PMCID: PMC5102197.

been discharged from hospice eligibility before being enrolled by VITAS, was still alive and receiving nutrition through a PEG tube as of 2020 – six years after VITAS's admission.

102. Patient 5 was a female in her 90s residing in an ALF with a diagnosis of cerebral atherosclerosis. She was certified as hospice-eligible by VITAS on February 10, 2017, and remained in VITAS's care as of 2020. All medical records demonstrate that Patient 5 had a good appetite, was ambulatory, and had a PPS of 40% with no documentation of a FAST Score, which is necessary for determining hospice criteria for dementia patients. As the clinical director over facilities, one Relator saw many patients similar to Patient 5 who were living with non-terminal conditions in ALFs.

103. Patient 6 was in her 50s when she was admitted to VITAS hospice with a diagnosis of cerebral infarction or stroke. Although VITAS certified that Patient 6 had an end-stage stroke with a PPS scored between 30 to 40, her medical documentation did not support that finding: the patient ambulated with a walker; had a healthy BMI of 22; was alert and oriented to person, place, and time; communicated verbally; and had a good appetite and the ability to feed herself. More than three years following admission, Patient 6 remained in stable condition in VITAS care – clearly, she did not meet the criteria for hospice.

38

## C. CRISIS CARE FRAUD

104.   VITAS knowingly submitted or caused the submission of false or fraudulent claims for CC services that were not medically necessary because the patients were not in crisis during the periods that VITAS claimed it provided the elevated level of care. Those false claims were paid by Medicare and Medicaid.

105.   All patients who are eligible for hospice are in very poor and rapidly declining health. The stated purpose of hospice is to offer non-curative care to keep a dying patient comfortable. Elevated crisis care is intended to address acute, short-term health issues when a hospice patient is experiencing severe and unmanageable symptoms and needs continuous nursing care beyond what can be provided by family or community caregivers. The goal of CC is to bring the patient out of crisis mode and back into a comfortable state. Patients experiencing non-acute symptoms of decline – as all hospice patients inevitably will – are not eligible for CC, and CC is not meant to be a substitute or stop-gap measure for other services.

39

106. Indeed, nationally, CC is a rare occurrence. The NHPCO reported that in 2018, CC represented just 0.2% of the days of care for hospice patients.[22]

**Table 3: Level of Care by % of Days of Care**

| LOC Metrics | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| RHC Days | 97.7% | 97.9% | 98.0% | 98.0% | 98.2% |
| CHC Days | 0.3% | 0.3% | 0.3% | 0.2% | 0.2% |
| IRC Days | 0.3% | 0.3% | 0.3% | 0.3% | 0.3% |
| GIP Days | 1.7% | 1.6% | 1.6% | 1.3% | 1.2% |

Source: MedPAC March Report to Congress, Various years

107. Thus, for the year 2018, patients across the country spent an average of less than 1 day (0.73 days, or 365 x 0.002) in CC. Looked at another way, on any given day in 2018, only 0.2% of patients would be on CC.

108. But the CC level of care is far more common at VITAS. According to a Broward program census for May 16, 2020, at least 65 out of 1811 patients were on CC that day. That ratio – 3.6% of the patients – makes that day's CC level of care *eighteen* times the national rate of 0.2%.

109. It was also more common for patients to have been on CC for numerous days. A March 11, 2020, CC census for the Broward program show that

---

[22] *See* NHPCO Facts and Figures (2020 ed., pub'd Aug. 20, 2020). https://www.nhpco.org/factsfigures/.

14 patients, or approximately 0.7%, had been in CC for more than three days.

110.    Corporate communications show VITAS management's day-over-day preoccupation with CC patient numbers and staffing mix. The emails demonstrate that their main concerns were (1) increasing and sustaining the number of patients placed on CC; and (2) minimizing the number and skill of staffing providing CC services.

111.    Upper management regularly sent emails praising ground-level managers when CC numbers went up and pressing the need for more CC referrals. One email from a national VITAS Performance Analyst to management dated December 13, 2019, illustrates the true purpose behind this messaging. The email cites CC statistics for the month of November 2019 as evidence of ways in which the company failed to meet its CC revenue goals. Referring to "Lost R" (lost revenue), the email points out that the company lost CMS reimbursement at the higher CC rate because staff did not log a minimum of eight bedside hours in a day or because CC referrals were made after 4pm, with fewer than eight hours left in the day.

112.    VITAS management did not even attempt to conceal their business plan of increasing profit margins by putting ineligible patients on CC. The more patients for whom VITAS could receive the CC reimbursement rate, the better the company's bottom line. In an email dated April 8, 2020, VITAS Patient Care

41

Administrator Cynthia Hazim-Camacho told team managers to "reinforce" the need to put more patients – including "all patients with falls" – on CC level, and attached a chart of "symptoms that warrant placing a patient on CC." The attachment specifically stated that "[t]he IDEAL hospice patient should have many CC starts and stops" and included a directive that patients exhibiting the following conditions, among others, must be placed on CC: anxiety, cold symptoms, constipation, diarrhea, itching, incontinence, and fever. The document also directed that end-stage terminal patients and those needing education for use of medical devices be placed on CC.

113.   At VITAS, Registered Nurses ("RN")[23] receive the highest level of pay, followed by Licensed Practical Nurses ("LPN")[24] and then Home Health Aides ("HHA").[25]

114.   Under the VITAS corporate structure, Interdisciplinary Team

---

[23] An RN is a nurse who has completed a 2- to 4-year degree program in nursing. RNs provide direct patient care for acutely or chronically ill patients, and are often in charge of monitoring patients, taking vital signs, administering medications, documenting the patients' history, among other things.

[24] LPNs provide basic nursing care under the supervision of an RN or other healthcare practitioner. The scope of LPN duties may include feeding, dressing or bathing patients. Monitoring patient vital signs, including blood pressure and temperature.

[25] An HHA is a trained and certified health-care worker who provides assistance to a patient in the home with personal care (as hygiene and exercise) and light household duties (as meal preparation) and monitors the patient's condition.

Managers were responsible for reporting CC enrollment and assigning RNs, LPNs, and HHAs to provide CC patient services. VITAS managers sent daily "census" emails documenting the number of patients currently placed on CC and the level of staff (i.e., RN, LPN, or HHA) assigned to the patient.

115. Management was very focused on "skill mix," the ratio of RN, LPN, and HHA providers assigned to care for a patient. Team Managers were regularly asked to justify or re-staff cases if management determined that too many RNs or LPNs were being used, instead of lower-paid HHAs. The corporate communications make clear that VITAS's goal was to minimize skilled nursing hours in favor of HHAs. VITAS well knew that the CMS reimbursement rate for CC is unaffected by the skill level of providers, so long as the CC patient is getting "predominantly nursing care." By favoring HHAs as much as possible for CC patient care, VITAS sought to retain higher profits from its CMS reimbursements.

116. One of the Relators received regular email communications from VITAS management questioning the number of LPNs staffed to CC patients and directing the replacement of skilled nurses with HHAs. Relator was routinely pressured by corporate managers to minimize the use of LPNs, and understood from their directives and communications that the purpose of staffing CC care teams with HHAs was to reduce the company's costs and maximize profits.

117. Taken together, these corporate directives make clear the obvious:

VITAS managers instructed supervisory staff to place patients on CC who did not meet the CMS criteria and to provide them with the lowest-possible level of nursing care. The emails and documents in Relators' possession, along with Relators' detailed recounting of high-level conversations and meetings, establish that VITAS management's decisions on patient care levels are demonstrably driven by statistics and profits, and that the company acted in purposeful contravention of federal law and CMS regulations.

## 1. EXAMPLES OF VITAS PATIENTS IMPROPERLY PLACED OR MAINTAINED ON CC

118.    As with hospice eligibility, a review of patient records reveals numerous instances of patients being improperly placed or inappropriately continued on crisis care. Following are a few examples.[26]

119.    CC Patient 1 was in her 90s and living in an ALF when she was admitted to CC for "agitation" on July 12, 2017. VITAS continued CC Patient 1 on crisis care for more than five weeks despite chart notes on July 13, 2017, describing her as awake, alert, smiling, eating well, and responding to commands during that period of time. While it was noted that she experienced some periods of forgetfulness and needed some assistance with daily living activities, other entries

---

[26] Because Relators left VITAS's employment in 2020, they are unable to provide patient documentation beyond that time. On information and belief, at least some of the exemplar patients are living VITAS patients as of the date of filing of this Complaint.

state that CC Patient 1 had "no issues with pain," was "alert [and] oriented," and was "calm and in no apparent distress." It is clear from the records that even if CC Patient 1 had needed a brief increase to CC level of care to address agitation issues, any crisis had resolved within a day of CC admission, and the patient should have been transitioned back to routine care.

120.   CC Patient 2 was a lung cancer patient in his 60s who was living alone at the time he was elevated to CC status on May 12, 2020, ostensibly to address pain and shortness of breath. However, the CC nursing notes do not support this justification for heightened level of care; the notes repeatedly state that while on crisis care, CC Patient 2 denied pain, was not in distress, was eating well, and was able to breath without supplemental oxygen. Instead of managing a crisis, the CC nurses documented that they provided basic assistance with daily living activities – which is an impermissible use of CC funding.

121.   CC Patient 3  was an ALF resident and stroke patient in his 80s when he was placed on CC for two weeks beginning March 19, 2016, after experiencing some general and expected decline. The chart notes document that CC Patient 3 was placed on elevated care for "failure to thrive, mental deterioration, [and] difficulty swallowing" – insufficient reasons for a hospice patient to be considered in crisis.  While on crisis-level care, nursing notes document that CC Patient 3 was taking his medications orally, alert and coherent, able to answer questions

45

appropriate, and denying respiratory distress and pain. CC Patient 3 should not have been placed on crisis care in the first place, much less kept there for an extended period of time.

122.   CC Patient 4 spent more than three months on crisis care status, from November 27, 2019, through March 2, 2020, after she moved out of her son's home to live alone. Although the records stated that CC Patient 4 was admitted for pain, a chart note evidences the true reason: "I am concerned that if there is not a staff member here she will most likely take all of the medications at once, reason for which I feel she remains appropriate for Continuous Care until we can find a more permanent solution, better supervision, or hopefully placement in a long-term care facility where she can have closer monitoring in regard to her medication." CC is not a substitute for long-term care placement or respite care for family – particularly for a patient who appeared to be ineligible for even routine home care according to a doctor's note from February 27, 2020, "The patient's respiratory symptoms appear at baseline. I do not see any evidence of exacerbation, there is no worsening cough, no chest pain, no palpitations, no fever, no chills. Her appetite is fair. She tends to favor non-nutritional foods. She uses oxygen continuously. She did move her bowels and has been urinating without difficulty. There is no report of falls. The patient can stand and transfer on her own. She needs assistance with certain activities of daily living. There is no report of nausea, vomiting, no

46

palpitations, no headache or dizziness. No chest pain, no abdominal discomfort, no focal weakness of numbness."

123. CC Patient 5 was an end-stage endometrial cancer patient when she was placed on CC for more than two weeks beginning August 22, 2016. Records indicated that CC Patient 5 experienced "generalized weakness," but was not in acute distress and she appeared to be "awake, alert, and oriented." Although CC Patient 5 was nearing death, her condition was  not a crisis; it was a natural progression of the disease for which routine palliative treatment was appropriate.

124. CC Patient 6  was a female ALF resident in her 80s with multiple end-stage diagnoses when she was placed on CC for several months, from November 2019 to May 2020, for the purpose of educating her caregivers about medication administration.  But CC Patient 6 resided in an ALF where she was cared for by a team of professionals who certainly did not need to be "educated" on how to administer medications. While it does appear that CC Patient 6's husband expressed frustration with her combative behavior, the nurse's notes state that CC Patient 6 was in no pain, had unlabored respirations, and was restless only at times. While CC Patient 6's family may have wanted round-the-clock hospice care, the patient simply did not experience acute symptoms that met CC admission criteria.

125. Finally, CC Patient 7 was in her mid-70s and receiving hospice care at home with a diagnosis of cirrhosis of the liver. VITAS placed CC Patient 7 on

47

crisis care for several weeks, ostensibly for altered mental status and low blood pressure – but no medical documentation corroborates this diagnosis. While CC Patient 7 was often described as confused, her chart notes repeatedly that she stated she had no pain, and that she was alert and oriented to person and place, could follow instructions and respond to questions, and made her needs known to caregivers. Following a CC patient visit, one doctor wrote that CC Patient 7 was "pleasant and comfortable" – certainly not the description of a patient experiencing an acute health trauma requiring elevated care.

## D. VIOLATIONS OF THE ANTI-KICKBACK STATUTE

126.    The purpose of the Anti-Kickback Statute is to ensure proper medical treatment and referrals and to limit unnecessary treatment, services, or goods that are based not on the needs of the patient but on improper incentives given to others, thereby limiting the patient's right to choose proper medical care and services.

127.   Paying kickbacks taints the provision of medical services, regardless of the medical necessity and/or the propriety of such services.  The kickback inherently interferes with the doctor-patient and/or facility-patient relationship and creates a conflict of interest, potentially putting the patient's health or well-being at risk.

128.   Defendants, well aware that kickbacks interfere with proper care and

are illegal, willfully and intentionally paid remuneration of various kinds to third parties to ensure a continuing supply of hospice patients was referred for VITAS hospice care.

129.   As an initial matter, the doctors who certify VITAS patients as eligible for Medicare hospice care are not staff or facility doctors; nor are they the patients' attending physicians.  VITAS contracts with retired part-time or private practice physicians for the sole purpose of certifying their patients as hospice eligible.  These doctors do not perform any other services for VITAS.  The doctors are paid a fee for each face-to-face visit the doctors have with patients for the purpose of assessing hospice eligibility.  Relators – who have seen the VITAS payroll – explain that there is a special payroll code VITAS uses to pay the doctors for certifications.  Because one – if not the only – purpose of the payments to these physicians is to obtain a certification of hospice eligibility, those payments are illegal kickbacks.

130.   Facilities are also paid kickbacks in furtherance of Defendants' scheme. Relators are aware that VITAS often markets to ALFs by offering to admit the ALF patients to hospice to allow those patients to stay in the assisted living facility, rather than transferring to a separately-owned skilled nursing facility. VITAS then provides hospice-funded nursing visits, HHAs, supplies, and services to the ALF residents. The kickback results in a corporate win-win: VITAS

49

claims reimbursement for more hospice patients, while the ALFs reap the financial benefits of keeping their patients while also getting "free" supplies and nursing services funded through VITAS's government reimbursements.

131.   In addition, Defendants provide benefits to nursing facilities to induce referrals.  VITAS provides hospice nurses and aides – supplemental staff not on the nursing facilities' payroll – if the facilities have a sufficient number of VITAS patients, thereby inducing the facilities to refer patients for hospice care with VITAS.

## E. UNLAWFUL RETALIATION

132.   VITAS discriminated and retaliated against both Relators, including threats, harassment, and discharge, because they were raising questions and making official reports to their supervisors about VITAS's unlawful practices that serve as the basis for this action.

### 1. RETALIATION AGAINST RELATOR GALIT MARKS

133.   Relator Galit Marks, a Registered Nurse, was hired by VITAS on September 16, 2019, as a Patient Care Administrator with VITAS's Broward program located in Florida, where she was charged with overseeing patient care services, supervising patient care staff, and managing quality control and regulatory compliance programs. In addition, she oversaw implementation of the company's education department, employee performance improvement

50

department, and the staffing department.

134.    At the beginning of her tenure, Ms. Marks received positive evaluations from managers, including VITAS Broward General Manager George Tokesky, VITAS Broward Assistant General Manager Donna Borland, and Corporate Patient Care Administrator Lazaro Cuervo.

135.    However, soon after she began working for VITAS, Ms. Marks began to notice red flags regarding the company's practices, including the noncompliance with the legal and regulatory obligations that serves as the basis for this False Claims Act case.

136.    Ms. Marks lived by the "see something, say something" creed – when she recognized a potential legal or ethical problem, she reported her concerns to management.

137.    Within weeks of her first day on the job, Ms. Marks began speaking to VITAS management, including Mr. Cuervo and Mr. Tokesky, and reporting her concerns about noncompliance with physician visits to patients and missing documentation in interdisciplinary group reports. Ms. Marks believed that VITAS's practices violated Medicare requirements, and she shared that concern with her supervisors, believing that they would agree with her that the compliance issues should be immediately addressed.

138.    This objection constitutes protected activity under the federal False

Claims Act. 31 U.S.C. § 3730(h)(1).

139.   In direct response to same, VITAS management embarked on a campaign of harassment against Ms. Marks.

140.   Within a week of her first disclosures to Mr. Cuervo and Mr. Tokesky, Ms. Marks began to experience harassment and discrimination at work. She was cut out of management meetings, called into Ms. Borland's office multiple times for unofficial reprimands, and questioned about her work. Mr. Tokesky would call her after hours to reprimand her, and Mr. Cuervo called a special meeting with Ms. Marks, during which he asked her why she was raising so many questions about the company's practices and insinuated that she was failing at her job.

141.   The temporal proximity between Ms. Marks' objections and the retaliation is close in time.

142.   In mid-February 2020, Ms. Marks could no longer tolerate the retaliatory treatment she was receiving at VITAS. She emailed Mr. Tokesky her 30-day notice, and then began her regular patient visits for that day. Approximately one hour later, while she was in the field meeting with her team, Ms. Marks checked her mobile phone and found six missed calls and multiple text messages from VITAS HR Director Elysa Adams demanding that she return to the office.

143.   When Ms. Marks returned to the office, she was met by Ms. Adams,

52

taken into a conference room, and fired on the spot. Ms. Adams refused to allow Ms. Marks to collect her personal belongings from her office, and had her escorted out of the building.

144.    A reasonable person in Ms. Marks' position would have felt compelled to resign in light of being faced with the prospect of working for a company that was violating the law, or leaving said illegal workplace. Accordingly, Ms. Marks was constructively discharged from her employment.

145.    But for Ms. Marks' objections, she never would have been retaliated against under the law.

### 2.  RETALIATION AGAINST RELATOR VILMA GARCIA

146.    Relator Vilma Garcia, a Registered Nurse, was hired by VITAS in 2007 and was transferred and promoted within the company multiple times. In July 2019, after serving as a telecare Patient Care Administrator for four years, she was promoted to the position of clinical Patient Care Administrator with VITAS's Broward program located in Florida, where she was charged with overseeing patient care services, supervising patient care staff, and managing quality control and regulatory compliance programs.

147.    After assuming the clinical Patient Care Administrator role, Ms. Garcia began to notice VITAS practices, described above, that appeared to be out of compliance with the legal and regulatory requirements of which she was

53

charged with enforcement. She repeatedly reported her concerns to company management.

148.    For example, from the time she began her administrative position, Ms. Garcia was pressured by VITAS management to increase the number of patients on CC status. She repeatedly told VITAS managers, including George Tokesky, Donna Borland, and Lazarus Cuervo, that the company was placing ineligible patients into CC level care, and that if the medical documentation did not support CC status for a patient, the company could not justify placement of that patient on the higher level of care in order to meet VITAS's census mandates.

149.    Ms. Garcia also raised repeated concerns with VITAS Broward Program's Medical Director, Dr. Jeffrey Wallace, that patients being recertified for hospice care did not meet eligibility requirements.

150.    All of the foregoing reporting/objections constitute protected activity under the federal False Claims Act. 31 U.S.C. § 3730(h)(1).

151.    On or about January 28, 2020, Ms. Garcia was questioned by VITAS HR Director Elysa Adams during the company's internal investigation of the complaint made by Relator Galit Marks; during this meeting, she shared information that verified Ms. Marks's complaints, and again raised her own concerns regarding VITAS's practices.

152.    Two days after making this statement to Ms. Adams – and six months

54

after beginning her Patient Care Administrator role – Ms. Garcia received a "90 Day Probationary Evaluation" notice on January 30, 2020, advising that she had "failed" her probationary period and was subject to disciplinary action. The notice contained inaccurate and incomplete information.

153.   Ms. Garcia sought meetings with her managers, communicated her efforts in writing, and made multiple written requests for meetings and clarifications with supervisors, advising that she wanted to "meet expectations and excel in [her] role as PCA in the program."

154.   Despite her considerable efforts to meet the demands of VITAS management, on March 9, 2020, VITAS delivered a "Last Chance Agreement" to Ms. Garcia, purporting to set forth job performance expectations and warning that "failure to comply with the conditions… may result in the immediate termination of [her] employment." The "conditions" included in this "Last Chance Agreement" were nebulous at best, and so subjective and unmeasurable that Ms. Garcia's non-compliance was virtually assured.

155.   Between December 2019 and May 2020, VITAS managers required Ms. Garcia to meet with them multiple times, to complete a training module designed for new hires, and to track and justify her communications within the company.

156.   As a result of VITAS taking disciplinary action steps shortly after Ms.

55

Garcia gave her statement to HR, Ms. Garcia feared that VITAS managers were setting her up for failure.

157. After months of discrimination and harassment against Ms. Garcia following her HR meeting and multiple reports of concerns about the company's lack of compliance with hospice regulations, VITAS terminated Ms. Garcia's employment on May 27, 2020.

158. The temporal proximity between Ms. Garcia's objections and Defendants' continuing retaliation and harassment is close.

159. But for Ms. Garcia's objections, she never would have been terminated.

## VI. GLOSSARY AND CHARTS

| ADL | Activities of Daily Living (an indicator of how much assistance a patient needs). |
|---|---|
| ALF | Assisted Living Facility |
| ATC | Around the Clock |
| BMI | Body Mass Index |
| BP | Blood Pressure |
| CC | Crisis or Continuous Care |
| CHC | Continuous Health Care, *i.e.*, CC |
| Contract Bed | An in-patient bed (i.e., for in-patient level of care) |
| CVA | Cerebrovascular Accident |
| Ejection Fraction | Heart failure measurement; 45% or less is considered low |
| Fast Scale | Functional Assessment Staging Test for dementia -  See chart below |
| H&P | History & Physical |
| HHA | Home Health Aide |

| IHC | In-patient Health Care (an increased level of care over RHC) |
|---|---|
| LOS | Length of Stay |
| LPN | Licensed Practical Nurse |
| MAC | Mid-Arm Circumference (a means to measure body mass) |
| NP | Nurse Practitioner |
| PO | Intake by mouth |
| PPS | Palliative Performance Scale -  See chart below |
| RHC | Routine Health Care |
| RN | Registered Nurse |

## The Functional Assessment Staging Test

| Stage | Stage Name | Characteristic | Expected Untreated AD Duration (months) | Mental Age (years) | MMSE (score) |
|---|---|---|---|---|---|
| 1 | Normal Aging | No deficits whatsoever | -- | Adult | 29-30 |
| 2 | Possible Mild Cognitive Impairment | Subjective functional deficit | -- | | 28-29 |
| 3 | Mild Cognitive Impairment | Objective functional deficit interferes with a person's most complex tasks | 84 | 12+ | 24-28 |
| 4 | Mild Dementia | IADLs become affected, such as bill paying, cooking, cleaning, traveling | 24 | 8-12 | 19-20 |
| 5 | Moderate Dementia | Needs help selecting proper attire | 18 | 5-7 | 15 |
| 6a | Moderately Severe Dementia | Needs help putting on clothes | 4.8 | 5 | 9 |
| 6b | Moderately Severe Dementia | Needs help bathing | 4.8 | 4 | 8 |
| 6c | Moderately Severe Dementia | Needs help toileting | 4.8 | 4 | 5 |
| 6d | Moderately Severe Dementia | Urinary incontinence | 3.6 | 3-4 | 3 |
| 6e | Moderately Severe Dementia | Fecal incontinence | 9.6 | 2-3 | 1 |
| 7a | Severe Dementia | Speaks 5-6 words during day | 12 | 1.25 | 0 |
| 7b | Severe Dementia | Speaks only 1 word clearly | 18 | 1 | 0 |
| 7c | Severe Dementia | Can no longer walk | 12 | 1 | 0 |
| 7d | Severe Dementia | Can no longer sit up | 12 | 0.5-0.8 | 0 |
| 7e | Severe Dementia | Can no longer smile | 18 | 0.2-0.4 | 0 |
| 7f | Severe Dementia | Can no longer hold up head | 12+ | 0-0.2 | 0 |

**Palliative Performance Scale**

| PPS Level | Ambulation | Activity & Evidence of Disease | Self-Care | Intake | Conscious Level |
|---|---|---|---|---|---|
| 100% | Full | Normal activity & work No evidence of disease | Full | Normal | Full |
| 90% | Full | Normal activity & work Some evidence of disease | Full | Normal | Full |
| 80% | Full | Normal activity *with* Effort Some evidence of disease | Full | Normal or reduced | Full |
| 70% | Reduced | Unable Normal Job/Work Significant disease | Full | Normal or reduced | Full |
| 60% | Reduced | Unable hobby/house work Significant disease | Occasional assistance necessary | Normal or reduced | Full or Confusion |
| 50% | Mainly Sit/Lie | Unable to do any work Extensive disease | Considerable assistance required | Normal or reduced | Full or Confusion |
| 40% | Mainly in Bed | Unable to do most activity Extensive disease | Mainly assistance | Normal or reduced | Full or Drowsy +/- Confusion |
| 30% | Totally Bed Bound | Unable to do any activity Extensive disease | Total Care | Normal or reduced | Full or Drowsy +/- Confusion |
| 20% | Totally Bed Bound | Unable to do any activity Extensive disease | Total Care | Minimal to sips | Full or Drowsy +/- Confusion |
| 10% | Totally Bed Bound | Unable to do any activity Extensive disease | Total Care | Mouth care only | Drowsy or Coma +/- Confusion |
| 0% | Death | - | - | - | - |

## VII.    COUNTS

### COUNT ONE

### *(Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A))*

160.    Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

161.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1).

162.    By virtue of the conduct described above, Defendants knowingly presented or caused to be presented false or fraudulent reimbursement claims for hospice care to CMS for patients who were falsely certified as "terminally ill" to meet the eligibility criteria for hospice services.

163.    Further, Defendants knowingly presented or caused to be presented to

CMS false or fraudulent claims for reimbursement for crisis care level of service for patients who, in actuality, do not require continuous care in order to achieve palliation and management of acute medical symptoms. Defendants knowingly and intentionally submitted these false or fraudulent claims in order to seek approval and payment from the United States Government. *See* 42 U.S.C. § 1395f(a)(7)(A); 42 U.S.C. § 1395x(dd)(1)(I); 42 U.S.C. § 1395y(a)(1)(C); 42 C.F.R. § 418.20; 42 C.F.R. § 418.22; 42 C.F.R. § 204(a); 42 C.F.R. § 418.302(b)(2); CMS Form 855i.

164.   Further, Defendants knowingly and willfully offered or paid remuneration to induce or reward patient referrals for the generation of Defendants' business involving hospice care services payable by government payers. By virtue of the conduct described above, including Defendants' payments to doctors to certify and recertify patients for hospice care and Defendants' provision of services and staffing to residential facilities in exchange for hospice referrals, Defendants violated the anti-kickback provisions of law. *See* 42 U.S.C. § 1320a-7b(b).

165.   Each initial certification of eligibility for hospice services of a new patient who did not meet "terminally ill" criteria represents a separate false or fraudulent claim.

166.   Each recertification of continuing eligibility for hospice services of a patient who did not meet "terminally ill" criteria represents a separate false or

59

fraudulent claim.

167.   Each claim for reimbursement for crisis care level of service for patients who did not require crisis care represents a separate false or fraudulent claim.

168.   Each patient referral, certification, and recertification made as a result of Defendants' illegal kickbacks represents a separate false or fraudulent claim.

169.   The United States, unaware of the false or fraudulent nature of the claims that Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

170.   By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWO

### *(Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B))*

171.   Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

172.   This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

173.   By virtue of the conduct described above, Defendants knowingly caused to be made or used false records or statements that caused false claims to be paid or approved by the United States Government.  Among other things,

Defendants submitted verified CMS-1450 forms for approval and payment, which included false or fraudulent records and statements regarding patient eligibility for hospice certification, recertification, and crisis care level of service. *See* 42 C.F.R. § 418.20; 42 C.F.R. § 418.22; 42 U.S.C. § 1395f(a)(7)(A).

174.    Further, Defendants knowingly and willfully offered or paid remuneration to induce or reward patient referrals for the generation of Defendants' business involving hospice care services payable by government payers. By virtue of the conduct described above, including payments to doctors to sign CMS-1450 forms certifying and recertifying ineligible patients for hospice care, Defendants violated anti-kickback provisions of law. *See* 42 U.S.C. § 1320a-7b(b).

175.    Each verified CMS-1450 form submitted to certify as eligible for hospice services a patient who did not meet "terminally ill" criteria represents a separate false or fraudulent record or statement.

176.    Each verified CMS-1450 form submitted to recertify as continuingly eligible for hospice services a patient who did not meet "terminally ill" criteria represents a separate false or fraudulent record or statement.

177.    Each verified CMS-1450 form submitted for reimbursement of crisis care level of service for patients who did not require it represents a separate false or fraudulent record or statement.

178.   Each verified CMS-1450 form submitted as a result of Defendants' illegal kickbacks represents a separate false or fraudulent record or statement.

179.   The United States, unaware of the false or fraudulent nature of the claims that Defendant caused, paid for claims that otherwise would not have been allowed.

180.   By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## COUNT THREE

### *(Violation of the False Claims Act, 31 U.S.C. § 3729(a)(7))*

181.   Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

182.   This is a claim for treble damages and civil penalties under the reverse false claims provision of the False Claims Act, 31 U.S.C. § 3729(a)(7).

183.   By virtue of the conduct described above, Defendants knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendants did not report or return to CMS or any other government entity the overpayments they received as a result of their false or fraudulent claims, records, statements, and representations. 42 U.S.C. § 1320a-7k(d).

184.    The United States, unaware of the false or fraudulent nature of the claims that Defendant caused, paid for claims that otherwise would not have been allowed.

185.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## COUNT FOUR

### *(Violation of the California False Claims Act, Cal. Gov't Code §§ 12650 et seq.)*

186.    Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

187.    This is a claim for treble damages and civil penalties under the California False Claims Act, Cal. Gov't Code §§ 12650 *et seq*.

188.    By virtue of the Defendants' fraud scheme described above, whereby (1) California Medicaid patients were falsely certified as hospice eligible; (2) California Medicaid patients were placed or maintained on unnecessary crisis care; and (3) physicians were paid kickbacks to certify California Medicaid patients as hospice eligible, Defendants knowingly presented or caused to be presented to MediCal, the California Medicaid program, false or fraudulent claims for payment or approval.

189.    Moreover, by virtue of the fraud scheme and submissions of non-reimbursable claims described above, Defendants conspired to commit violations

63

of the California False Claims Act.

190. MediCal, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

191. By reason of these payments, MediCal has been damaged, and continues to be damaged, in a substantial amount.

### COUNT FIVE

***(Violation of the Connecticut False Claims Act, C.G.S. § 4-274 et seq.)***

192. Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

193. This is a claim for treble damages and civil penalties under the Connecticut False Claims Act, C.G.S. § 4-274 *et seq.*

194. By virtue of the Defendants' fraud scheme described above, whereby (1) Connecticut Medicaid patients were falsely certified as hospice eligible; (2) Connecticut Medicaid patients were placed or maintained on unnecessary crisis care; and (3) physicians were paid kickbacks to certify Connecticut Medicaid patients as hospice eligible, Defendants knowingly presented or caused to be presented to the Connecticut Medicaid Program false or fraudulent claims for payment or approval.

195. Moreover, by virtue of the fraud scheme and submission of non-

reimbursable claims described above, Defendants conspired to commit violations of the Connecticut False Claims Act.

196. The Connecticut Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

197. By reason of these payments, the Connecticut Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT SIX

### *(Violation of the Delaware False Claims and Reporting Act, 6 Del. Code §§ 1201 et seq.)*

198. Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

199. This is a claim for treble damages and civil penalties under the Delaware False Claims And Reporting Act, 6 Del. Code §§ 1201 *et seq*.

200. By virtue of the Defendants' fraud scheme described above, whereby (1) Delaware Medicaid patients were falsely certified as hospice eligible; (2) Delaware Medicaid patients were placed or maintained on unnecessary crisis care; and (3) physicians were paid kickbacks to certify Delaware Medicaid patients as hospice eligible, Defendants knowingly presented or caused to be presented to the Delaware Medicaid Program false or fraudulent claims for payment or approval.

201. Moreover, by virtue of the fraud scheme and submission of non-

65

reimbursable claims described above, Defendants conspired to commit violations of the Delaware False Claims And Reporting Act.

202. The Delaware Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

203. By reason of these payments, the Delaware Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT SEVEN

### (Violation of the District of Columbia False Claims Act, D.C. Code §§ 2-381.02 et seq.)

204. Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

205. This is a claim for treble damages and civil penalties under the District of Columbia False Claims Act, D.C. Code §§ 2-381.02 et seq.

206. By virtue of the Defendants' fraud scheme described above, whereby (1) D.C. Medicaid patients were falsely certified as hospice eligible; (2) D.C. Medicaid patients were placed or maintained on unnecessary crisis care; and (3) physicians were paid kickbacks to certify D.C. Medicaid patients as hospice eligible, Defendants knowingly presented or caused to be presented to the District of Columbia Medicaid Program false or fraudulent claims for payment or approval.

207. Moreover, by virtue of the fraud scheme and submission of non-

66

reimbursable claims described above, Defendants conspired to commit violations of the District of Columbia False Claims Act.

208. The District of Columbia Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

209. By reason of these payments, the District of Columbia Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT EIGHT

### *(Violation of the Florida False Claims Act, Fla. Stat. Ann. §§ 68.081 et seq.)*

210. Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

211. This is a claim for treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. Ann. §§ 68.081 *et seq*.

212. By virtue of the Defendants' fraud scheme described above, whereby (1) Florida Medicaid patients were falsely certified as hospice eligible; (2) Florida Medicaid patients were placed or maintained on unnecessary crisis care; and (3) physicians were paid kickbacks to certify Florida Medicaid patients as hospice eligible, Defendants knowingly presented or caused to be presented to the Florida Medicaid Program false or fraudulent claims for payment or approval.

213. Moreover, by virtue of the fraud scheme and submission of non-

67

reimbursable claims described above, Defendants conspired to commit violations of the Florida False Claims Act.

214.   The Florida Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

215.   By reason of these payments, the Florida Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT NINE

### *(Violation of the Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 et seq.)*

216.   Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

217.   This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 *et seq*.

218.   By virtue of the Defendants' fraud scheme described above, whereby (1) Georgia Medicaid patients were falsely certified as hospice eligible; (2) Georgia Medicaid patients were placed or maintained on unnecessary crisis care; and (3) physicians were paid kickbacks to certify Georgia Medicaid patients as hospice eligible, Defendants knowingly presented or caused to be presented to the Georgia Medicaid Program false or fraudulent claims for payment or approval.

219.   Moreover, by virtue of the fraud scheme and submission of non-

reimbursable claims described above, Defendants conspired to commit violations of the Georgia False Medicaid Claims Act.

220. The Georgia Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

221. By reason of these payments, the Georgia Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TEN

### *(Violation of the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1 et seq.)*

222. Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

223. This is a claim for treble damages and civil penalties under the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1 *et seq*.

224. By virtue of the Defendants' fraud scheme described above, whereby (1) Illinois Medicaid patients were falsely certified as hospice eligible; (2) Illinois Medicaid patients were placed or maintained on unnecessary crisis care; and (3) physicians were paid kickbacks to certify Illinois Medicaid patients as hospice eligible, Defendants knowingly presented or caused to be presented to the Illinois Medicaid Program false or fraudulent claims for payment or approval.

225. Moreover, by virtue of the fraud scheme and submission of non-

reimbursable claims described above, Defendants conspired to commit violations of the Illinois False Claims Act.

226. The Illinois Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

227. By reason of these payments, the Illinois Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT ELEVEN

### *(Violation of the New Jersey False Claims Act, N.J. Stat. §§ 2A:32C-1 et seq.)*

228. Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

229. This is a claim for treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. §§ 2A:32C-1 *et seq*.

230. By virtue of the Defendants' fraud scheme described above, whereby (1) New Jersey Medicaid patients were falsely certified as hospice eligible; (2) New Jersey Medicaid patients were placed or maintained on unnecessary crisis care; and (3) physicians were paid kickbacks to certify New Jersey Medicaid patients as hospice eligible, Defendants knowingly presented or caused to be presented to the New Jersey Medicaid Program false or fraudulent claims for payment or approval.

231. Moreover, by virtue of the fraud scheme and submission of non-reimbursable claims described above, Defendants conspired to commit violations of the New Jersey False Claims Act.

232. The New Jersey Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

233. By reason of these payments, the New Jersey Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT TWELVE

### *(Violation of the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 et seq.)*

234. Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

235. This is a claim for treble damages and civil penalties under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq.*

236. By virtue of the Defendants' fraud scheme described above, whereby (1) Texas Medicaid patients were falsely certified as hospice eligible; (2) Texas Medicaid patients were placed or maintained on unnecessary crisis care; and (3) physicians were paid kickbacks to certify Texas Medicaid patients as hospice eligible, Defendants knowingly presented or caused to be presented to the Texas Medicaid Program false or fraudulent claims for payment or approval.

71

237.    Moreover, by virtue of the fraud scheme and submission of non-reimbursable claims described above, Defendants conspired to commit violations of the Texas Medicaid Fraud Prevention Act.

238.    The Texas Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

239.    By reason of these payments, the Texas Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT THIRTEEN

### *(Violation of the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 et seq.)*

240.    Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

241.    This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 *et seq.*

242.    By virtue of the Defendants' fraud scheme described above, whereby (1) Virginia Medicaid patients were falsely certified as hospice eligible; (2) Virginia Medicaid patients were placed or maintained on unnecessary crisis care; and (3) physicians were paid kickbacks to certify Virginia Medicaid patients as hospice eligible, Defendants knowingly presented or caused to be presented to the Virginia Medicaid Program false or fraudulent claims for payment or approval.

72

243. Moreover, by virtue of the fraud scheme and submission of non-reimbursable claims described above, Defendants conspired to commit violations of the Virginia Fraud Against Taxpayers Act.

244. The Virginia Medicaid Program, unaware of the false or fraudulent nature of the claims Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

245. By reason of these payments, the Virginia Medicaid Program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT FOURTEEN

### *(Violation of the False Claims Act, 31 U.S.C. § 3730(h))*

246. Relators re-alleges and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

247. Relators' refusal to participate in Defendants' illegal and unethical activity during their employment at VITAS and their repeated attempts to both notify their superiors about the fraudulent nature of such activity and to change those practices are protected activities under the federal False Claims Act. 31 U.S.C. § 3730(h)(1).

248. In mid-February 2020, Defendants terminated Relator Galit Marks from her employment.

249. On May 27, 2020, Defendants terminated Relator Vilma Garcia from

her employment.

250.    Defendants did not have a legitimate, non-retaliatory reason for Relators' terminations. Any reason provided for Relators' terminations by Defendants is a pretext and a cover-up for illegal retaliation.

251.    The temporal proximity between Relators' objections to Defendants' fraudulent conduct and their termination is sufficiently close to create the necessary nexus between the events.

252.    By firing Relators in retaliation for their attempts to correct illegal and fraudulent conduct at VITAS, Defendants violated 31 U.S.C. § 3730(h)(1).

253.    Relators have suffered damages as a result of Defendants' retaliatory conduct, including lost wages, lost benefits, and lost employment status, as well as humiliation, pain and suffering, and other monetary and non-monetary losses.

## COUNT FIFTEEN

### *(Violation of the Florida False Claims Act, Fla. Stat. §§ 68.088)*

254.    Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

255.    Relators' refusal to participate in Defendants' illegal and unethical activity during their employment at VITAS and their repeated attempts to both notify their superiors about the fraudulent nature of such activity and to change those practices are protected activities under the Florida False Claims Act. Fla.

74

Stat. §§ 68.088.

256.   In mid-February 2020, Defendants terminated Relator Galit Marks from her employment.

257.   On May 27, 2020, Defendants terminated Relator Vilma Garcia from her employment.

258.   Defendants did not have a legitimate, non-retaliatory reason for Relators' terminations. Any reason provided for Relators' terminations by Defendants is a pretext and a cover-up for illegal retaliation.

259.   The temporal proximity between Relators' objections about Defendants' fraudulent conduct and their terminations is sufficiently close to create the necessary nexus between the events.

260.   By firing Relators in retaliation for their attempts to correct illegal and fraudulent conduct at VITAS, Defendants violated Fla. Stat. §§ 68.088.

261.   Relators have suffered damages as a result of Defendants' retaliatory conduct, including lost wages, lost benefits, and lost employment status, as well as humiliation, pain and suffering, and other monetary and non-monetary losses.

## VIII.    PRAYER FOR RELIEF

**WHEREFORE:**  Relators request that judgment be entered against Defendants, ordering that:

(i)    Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq*. and the State False Claims Acts;

75

(ii)    Defendants pay the United States not less than $11,803 and not more than $23,607[27] for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendants' actions, plus the appropriate amount to the States under similar provisions of their False Claims Acts;

(iii)   The Relators be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State False Claims Acts;

(iv)    The Relators be awarded all costs of this action, including attorneys' fees, pursuant to 31 U.S.C. § 3730(d) and similar provisions of the State False Claims Acts;

(v)     Defendants be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

(vi)    Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct; and

(vii)   The United States, the States, and the Relators recover such other relief as the Court deems just and proper.

## IX.    REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relators hereby demand a trial by jury.

---

[27] As adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461; *see also* 86 F.R. 6, at 1725 (DOJ January 11, 2021) (setting forth 2021 adjustments). https://www.govinfo.gov/content/pkg/FR-2021-01-11/pdf/2020-29024.pdf (accessed Apr. 2, 2021).

Dated: September 10, 2021          Respectfully submitted,


*Justin Brooks*
Justin S. Brooks (PA Bar No. 313123)
justin@whistleblowergroup.com
**GUTTMAN, FREIDIN & CELLER**
119 Coulter Ave., Suite 211
Ardmore, PA 19003
Tel: 866-738-6739

Reuben A. Guttman (PA Bar No. 61205)
reuben@whistleblowergroup.com
Traci L. Buschner (*pro hac vice* pending)
Traci@whistleblowergroup.com
Elizabeth H. Shofner (*pro hac vice* pending)
Elizabeth@whistleblowergroup.com
**GUTTMAN, FREIDIN & CELLER**
2000 P. St. NW, Suite 300
Washington, DC 20036
Tel: 866-738-6739

Whitney M. Untiedt (*pro hac vice* pending)
whitney@whistleblowergroup.com
**GUTTMAN, FREIDIN & CELLER**
2 S. Biscayne Blvd., Suite 3100
Miami, FL 33131
Tel: 866-738-6739

*Attorneys for Plaintiff - Relators*
*Vilma Garcia and Galit Marks*

77

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of this *qui tam* Complaint was served upon the following persons, via Certified Mail, return receipt requested, on September __, 2021.

/s/Aaron M. Verosky
Aaron M. Verosky

*VIA CERTIFIED MAIL*
*RETURN RECEIPT REQUESTED*

| | |
|---|---|
| **United States** | U.S. Attorney General Merrick Garland<br>United States Department of Justice<br>950 Pennsylvania Ave, NW<br>Washington, DC 20530<br><br>Mr. Andy Mao<br>Deputy Director, Commercial Litigation Branch - Fraud Section<br>United States Department of Justice<br>175 N. Street, NE<br>Washington, DC 20002<br><br>Acting U.S Attorney Jennifer A. Williams<br>E. District of Pennsylvania<br>U.S. Attorney's Office<br>615 Chestnut St., Suite 1250<br>Philadelphia, PA 19106 |
| **California** | Attorney General Rob Bonta<br>Office of the Attorney General<br>1300 "I" Street, Suite 1740<br>Sacramento, CA 95814 |
| **Connecticut** | Attorney General William Tong<br>Office of the Attorney General<br>165 Capitol Ave.<br>Hartford, CT 06106 |
| **Delaware** | Attorney General Kathy Jennings<br>Office of the Attorney General<br>Carvel State Office Building<br>820 North French Street<br>Wilmington, DE 19801 |
| **District of Columbia** | Attorney General Karl Racine<br>Office of the Attorney General<br>441 4th Street, NW<br>Suite 1100S<br>Washington, DC 20001 |

| | |
|---|---|
| **Florida** | Attorney General Ashley Moody<br>Office of the Attorney General<br>The Capitol PL-01<br>Tallahassee, FL 32399<br><br>Jimmy Patronis, CFO<br>Division of Legal Services<br>Florida Department of Financial Services<br>200 East Gaines Street<br>Tallahassee, FL 32399 |
| **Georgia** | Attorney General Chris Carr<br>Office of the Attorney General<br>40 Capitol Square, SW<br>Atlanta, GA 30334-1300 |
| **Illinois** | Attorney General Kwame Raoul<br>Office of the Attorney General<br>100 West Randolph Street<br>Chicago, IL 60601 |
| **New Jersey** | Acting Attorney General Andrew J. Bruck<br>Office of the Attorney General<br>RJ Hughes Justice Complex<br>25 Market Street, P.O. Box 080<br>Trenton, NJ 08625-0080 |
| **Texas** | Attorney General Ken Paxton<br>Office of the Attorney General<br>P.O. Box 12548<br>Austin, TX 78711 |
| **Virginia** | Attorney General Mark Herring<br>Office of the Attorney General<br>900 East Main Street<br>Richmond, VA 23219 |